# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| _____ | ) | |
| In re: | ) | Chapter 11 |
| | ) | Case No. 02-41045 |
| DEHON, INC., | ) | (Substantively Consolidated) |
| | ) | |
| Debtor | ) | |
| _____ | ) | |
| | ) | |
| STEPHEN S. GRAY, | ) | Adversary Proceeding |
| AS PLAN ADMINISTRATOR OF | ) | No. 04-04039 |
| DEHON, INC., | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WESTERN ENVIRONMENTAL | ) | |
| SERVICES & TESTING, INC., | ) | |
| | ) | |
| Defendant | ) | |
| _____ | ) | |
| | ) | |
| STEPHEN S. GRAY, | ) | Adversary Proceeding |
| AS PLAN ADMINISTRATOR OF | ) | No. 04-04040 |
| DEHON, INC., | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNIVERSITY OF ALASKA, | ) | |
| | ) | |
| Defendant | ) | |
| _____ | ) | |

1

_____
                                        )
STEPHEN S. GRAY,                        )   Adversary Proceeding
AS PLAN ADMINISTRATOR OF                )   No. 04-04047
DEHON, INC.,                            )
                                        )
        Plaintiff                       )
                                        )
v.                                      )
                                        )
ENERGY & ENVIRONMENTAL                  )
ANALYSIS, INC.,                         )
                                        )
        Defendant                       )
_____ )
                                        )
STEPHEN S. GRAY,                        )   Adversary Proceeding
AS PLAN ADMINISTRATOR OF                )   No. 04-04049
DEHON, INC.,                            )
                                        )
        Plaintiff                       )
                                        )
v.                                      )
                                        )
KINNETIC LABORATORIES,                  )
INC.,                                   )
                                        )
        Defendant                       )
_____ )
                                        )
STEPHEN S. GRAY,                        )   Adversary Proceeding
AS PLAN ADMINISTRATOR OF                )   No. 04-04272
DEHON, INC.,                            )
                                        )
        Plaintiff                       )
                                        )
v.                                      )
                                        )
INTERLIANCE, LLC.,                      )
                                        )
        Defendant                       )
_____ )

2

## MEMORANDUM OF DECISION

Before the Court are cross motions for summary judgment, in whole or in part,  filed in five adversary proceedings brought by Stephen S. Gray, the Plan Administrator (the "Plan Administrator") of the Chapter 11 plan of liquidation of Dehon, Inc.[1] (the "Debtor"). The Plan Administrator, pursuant to 11 U.S.C. §§ 547 and 550,[2] seeks to recover allegedly preferential payments made to each of the defendants (collectively, the "Defendants").  The Defendants have asserted in their respective pleadings that the preference actions may not be maintained because the underlying contracts were either actually assumed by the Debtor or should now be ordered assumed retroactively.  The Plan Administrator asks this Court to rule that the defense is unavailing.  The Defendants seek to end this litigation now through an order to the contrary.

I.    FACTS AND TRAVEL OF THE CASE

Each of the Defendants in these five adversary proceedings is a party to a prepetition contract with the Debtor: (1) Western Environmental Services & Testing, Inc. ("WEST") provided subcontract work in connection with a contract between the Debtor and the United States Department of Defense; (2) the University of Alaska (the "University") provided services in connection with a contract between the Debtor and the United States Department of Energy; (3) Energy & Environmental Analysis, Inc. ("EEA") provided

---

[1] The Debtor, formerly named Arthur D. Little, Inc., changed its name to Dehon, Inc. following the sale of substantially all its assets approved by this Court on April 29, 2002.

[2] Section references will hereinafter refer to sections under the United States Bankruptcy Code (the "Bankruptcy Code" or the "Code"), 11 U.S.C. §§ 101 et seq., unless otherwise stated.

3

subcontract work in connection with a contract between the Debtor and the California

Energy Commission; (4) Kinnetic Laboratories, Inc. ("Kinnetic") provided subcontract work

in connection with contracts between the Debtor and the United States Department of the

Interior; and (5) Interliance, LLC ("Interliance") provided subcontract work in connection

with a contract between the Debtor and the California Energy Commission.  For purposes

of the present summary judgment motions, the parties agree that the contracts are all

"executory" within the meaning of § 365 of the Bankruptcy Code.[3]

The Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy

Code on February 5, 2002 (the "Petition Date").[4]  Interliance and WEST were included on

the Debtor's "Schedule F - Creditors Holding Unsecured Nonpriority Claims."[5]  The

University, EEA and Kinnetic were not listed as creditors holding unsecured claims on

Schedule F.  None of the contracts were listed on the Debtor's  "Schedule G - Executory

Contracts and Unexpired Leases."

---

[3] The Code does not define the term "executory contract."  Courts have adopted somewhat different "tests" for determining whether or not a particular contract is executory, see, e.g., La Electronica, Inc. v. Capo-Roman (In re La Electronica, Inc.), 995 F.2d 320, 322 n.3 (1st Cir. 1993), and the First Circuit has not yet definitively adopted one of those "tests."  See id.; see also Ready Prod., Inc. v. Jarvis (In re Jarvis), 2005 WL 758805, *2 (Bankr. D.N.H. March 28, 2005). However, it is generally well-accepted that an executory contract is one where "performance is due to some extent on both sides." N.L.R.B. v. Bildisco & Bildisco, 465 U.S. 513, 522 (1977).

[4] Initially, Arthur D. Little, Inc. and eight of its subsidiaries filed separate petitions in the United States Bankruptcy Court for the District of Delaware.  The cases were transferred to the United States Bankruptcy Court for the District of Massachusetts on February 12, 2002.  On March 14 of that year, twelve additional affiliates commenced their cases in the District of Massachusetts, and all the cases were eventually consolidated.

[5]  The Debtor listed Interliance as holding an unsecured claim in the amount of $3,506.00 for "professional services" and WEST as holding an unsecured claim in the amount of $297.31 for "service."

In response to item 3a. on the Debtor's "Statement of Financial Affairs," which required the Debtor to list all payments on debts (totaling more than $600.00) in the 90 days preceding the commencement of the case, the Debtor attached a supplemental list. Each Defendant appears on that list, together with the amount of payments made to that Defendant within 90 days prior to the Petition Date.

On the Petition Date, the Debtor also filed a motion for authority to sell, pursuant to § 363, substantially all of the Debtor's assets, consisting of six separate lines of business, to the Debtor's prepetition secured lender (the "Stalking Horse"), subject to higher and better offers (the "Sale Motion"). Attached to the Sale Motion was the proposed purchase and sales agreement (the "Stalking Horse Agreement") between the Stalking Horse and Debtor. The Sale Motion also stated that the Debtor sought an order "authorizing the assumption of executory contracts in connection with the sale" pursuant to § 365 and "establishing the deadline by which parties to the proposed assumed contracts may object to the assumption and assignment of contracts and assert claims for the payment of cure amounts." In the portion of the Sale Motion marked "Assumption and Assignment of Executory Contracts," the Debtor stated that the Stalking Horse Agreement contemplated that "certain executory contracts" would be assumed and assigned to the buyer. The Stalking Horse Agreement anticipated that some executory contracts, not yet designated, could be assumed and assigned to the Stalking Horse, or other successful bidder, after notice to the non-debtor parties to such contracts and an opportunity to state cure amounts.

5

This Court approved the portion of the Sale Motion relating to notice and bidding procedures on March 4, 2002.[6] The "Notice of Intent to Sell Assets of Arthur D. Little, Inc. and Certain of Its Subsidiaries, Free and Clear of Liens, Claims and Encumbrances" (the "Sale Notice") gave notice to parties of the hearing date and objection deadline with regard to the Sale Motion and informed parties that the Debtor was seeking 1) leave to sell substantially all of its assets free and clear, 2) approval of the Stalking Horse Agreement and 3) authorization for the assumption and assignment of executory contracts in connection with the sale. The Sale Notice summarized the terms of the Stalking Horse Agreement, noting specifically that the buyer agreed to assume and pay "all obligations and liabilities arising under contracts assumed by the Buyer." No contracts were specifically identified in the Sale Notice as designated to be assumed and assigned by the Debtor. The Sale Notice provided that copies of the Sale Motion and the exhibits would be available on request. On March 5, 2002, the Sale Notice was served on Interliance and WEST, but was never served on the University, EEA or Kinnetic.

On March 29, 2002, the Debtors filed an expedited motion to establish cure costs for certain executory contracts and unexpired leases that the Debtors proposed to assume

---

[6] The Order approving the bidding procedures in connection with the sale (the "Bidding Procedures Order") established the time and manner of the solicitation of higher offers, defined a "Qualifying Bid" and established the dates and procedures for the auction of the assets in the event the Debtors received a Qualifying Bid before the deadline. The Bidding Procedures Order required any successful bidder to satisfy all requirements for the "assumption and assignment of agreements to be assumed and assigned pursuant to the Purchase Agreement" (e.g., adequate assurance of future performance) and required the buyer or the Debtor to serve notice on all parties to Assumed Contracts. In defining sufficient notice, the order stated that the Sale Motion and Bidding Procedures Order were to be served on, *inter alia*, "the non-debtor parties to the executory contracts proposed to be assumed and assigned to Buyer." The Bidding Procedures Order also established the deadline by which parties could object to "the proposed assumption and assignment of contracts and assert claims for the payment of cure amounts."

and assign under § 365, if requested to do so by a successful bidder (the "Cure Motion").[7]

Attached to the Cure Motion was a list of potential contracts and leases that the Debtor

would move to assume and assign should the successful bidder request.  None of the

Defendants' contracts were listed on the attachment and none of the Defendants were

served with the Cure Motion.  On April 2, 2002, this Court denied the Cure Motion, finding

that the motion "provide[d] objecting parties insufficient time to appropriately respond."  The

Debtor did not renew the motion.

After receiving several qualified bids by the April 2, 2002 bid deadline, the Debtor

conducted an auction sale (the "Auction") of substantially all of the Debtor's assets on April

3 and 4 of 2002.  At the conclusion of the Auction, TIAX, LLC ("TIAX") emerged as the

winning bidder for the Debtor's Technology & Innovation ("T&I") business.  The University,

EEA and Interliance contracts were associated with the T&I business purchased by TIAX.

ICF Consulting Group, Inc. ("ICF") was chosen as the winning bidder for the Debtor's

Global Environment & Risk ("GRE") and Public Sector Program Management ("PSPM")

businesses.  The WEST and Kinnetic contracts were associated with the business lines

purchased by ICF.

As contemplated by the Bidding Procedures Order, the Debtor entered into asset

purchase agreements  with each of the winning bidders.  The asset purchase agreement

between the Debtor and TIAX (the "TIAX Agreement"), section 1.01(a)(iv), provided for the

sale of the Debtor's "entire legal and beneficial right, title and interest in and to all Contracts

---

[7] The purpose of the Cure Motion was to establish cure costs in the event that the winning bidder designated a contract to be assumed.  See 11 U.S.C. § 365(b)(1).  Actual assumption of any contract, however, would be by way of separate motion and Court approval.

. . . related to the T&I Business."  Section 1.02 of the TIAX Agreement contemplated that

TIAX would designate certain contracts to be assumed pursuant to the agreement.[8]  The

asset purchase agreements between the Debtor and ICF (the "ICF Agreements") regarding

the GER and PSPM business lines were substantially similar; under section 1.01(a)(iv) of

each Agreement, included among the assets to be sold was "all of Seller's right, title and

interest in and to all agreements, proposals, contracts, leases, licenses, purchase orders,

contract rights and similar arrangements" related to the GER and PSPM business lines.

The TIAX Agreement and the ICF Agreements also contained identical provisions

making clear that each transaction was to be considered an "As Is Transaction":

> **8.02**  Buyer hereby acknowledges and agrees that, except as
> otherwise expressly provided in Section 2 of this agreement,
> the seller makes no representations or warranties whatsoever,
> express or implied, with respect to any matter relating to the
> [ ] Business, the subject assets or the seller, including, without
> limitation, . . . (E) the transferability of any asset . . . or (H) any
> other matter or thing relating to the [ ] Business, the subject
> assets, the seller or any portion thereof. . . . Accordingly,
> Buyer[s] will accept the [ ] Business and the subject assets at
> the closing "as is," "where is," and "with all faults."

On April 5, 2002, following the Auction, this Court conducted a hearing on the Sale

Motion (the "Sale Hearing") to consider, among other things, the proposed sale of T&I to

TIAX and the proposed sale of GER and PSPM to ICF.  At the Sale Hearing, the Court

instructed the Debtor to file a motion to assume and assign those executory contracts

---

[8] **1.02  Liabilities**. Upon the sale and purchase of the Subject Assets, Buyer (or its
designated Affiliates) shall assume and agree to pay or discharge when due in
accordance with their respective terms the following liabilities of the Seller (the
"Assumed Liabilities"): (i) all obligations and liabilities arising under the Contracts
assumed by Buyer . . . (collectively, the "Assumed Contracts") together with "cure
costs" associated with the Assumed Contracts . . . .

and/or leases the winning bidders wished to purchase as part of the sale.   Only two contracts were designated by the winning bidders as contracts to be assumed and assigned in conjunction with the sale.   Both contracts were real property leases, one of which was to be assumed and assigned pursuant to the TIAX Agreement.[9]   No other contracts, either executory contracts or real property leases, were designated by any of the winning bidders to be assumed and assigned by the Debtor.   Following notice to the non-debtor parties to the assumed leases and a hearing held on April 22, 2002, this Court approved the assumption and assignment of those leases.

On April 29, 2002, this Court entered an order (the "Sale Order") approving the sale (the "Sale"), which order, among other things, (1) approved the terms of the TIAX Agreement and the ICF Agreements and (2) further reiterated that those contracts to be assumed and assigned were identified in the earlier Notice of Intent to Assume and the assumption and assignment was approved by a prior Court order.   No additional executory contracts or leases were identified in the Sale Order.

Following the consummation of the Sale, it appears that TIAX and ICF continued to perform the Debtor's former role under the Defendants' contracts, and the Defendants continued to provide services in connection with those contracts.   According to the affidavits filed with their summary judgment motions, each Defendant, except perhaps EEA, received

---

[9] The other real property lease was assumed and assigned at the request of Charles River Associates, Inc., the successful bidder for the Debtor's Chemical and Energy Vertical business line. Neither Charles River Associates, Inc. nor the business line it purchased are associated with these adversary proceedings.

9

communications from either TIAX or ICF related to changes in the contracts;[10] however,

none of the Defendants ceased their performance, and, apparently, they were

compensated by the buyers for post-Sale work pursuant to the contracts.

The Debtor's "Second Amended Disclosure Statement with Respect to Second

Amended Plan of Liquidation of Dehon, Inc. and its Debtor Subsidiaries" (the "Disclosure

Statement") was approved on December 20, 2002. The Disclosure Statement contained

the following relevant provisions:

> The Debtors are not reorganizing their business; they are liquidating, and
> they will not be conducting any business operations following confirmation
> and consummation of the Plan other than winding down and disposing of
> assets, investigating and prosecuting Rights of Action and resolving claims
> not dealt with previously.
>
> * * *
> ### A.    Plan Overview
>
> The Plan calls for liquidation, rather than reorganization of the Debtors. The
> Plan accomplishes this objective by providing for: (i) compromise and

---

[10] In his affidavit filed on behalf of WEST, James E. Meador, Jr. stated that WEST "first received notice that ICF Consulting was somehow involved with [WEST]'s contract with [the Debtor] in an email sent to Western on June 4, 2002. . . . In that email [WEST] was advised that 'All members [related to WEST's] project are now located at 7 Wells Avenue, Newton, MA 02459.'" Subsequently, WEST received a letter from ICF which stated that WEST's "subcontract with ICF Consulting Services, LLC (formerly Arthur D. Little, Inc., Global Environment and Risk Americas) . . . will be concluded."

Greg Krier, in an affidavit filed on behalf of the University, stated that he received a letter from TIAX dated June 6, 2002.  The letter stated, "We are proud to announce that Arthur D. Little's Technology & Innovation business unit has become TIAX LLC . . . an independent, privately held company . . . . The transaction was finalized on May 7, 2002."

Kinnetic and ICF, according to the affidavit of Mark Savoie, entered into an amendment of the original contract between Kinnetic and the Debtor "after ICF informed Kinnetic that ICF had taken over the [Debtor's] contract."

In an affidavit filed on behalf of Interliance, Gloria Kamph stated that Interliance was notified of changes to the contracting party when "TIAX began paying Interliance for invoices it had previously submitted to [the Debtor]."

It is unclear what transpired between EEA and TIAX, as K.G. Duleep, in an affidavit filed on behalf of EEA, merely states that EEA did not receive notice of the Debtor's *bankruptcy case* until it was served with the complaint in the present adversary proceeding.

10

settlement of Claims and Interests; (ii) substantive consolidation of the Debtors' cases; and (iii) *rejection of executory contracts and unexpired leases to which any Debtor is a party.*

* * *

*[T]he Debtors will reject all executory contracts* and unexpired leases upon confirmation of the Plan, with certain minor exceptions. Thus, the Debtors will have terminated most contractual obligations, setting the stage for the eventual winding up and liquidation of all business and any remaining assets.

* * *

### E.    Treatment of Executory Contracts and Unexpired Leases
Except as otherwise provided in the Plan . . . each of the executory contracts and unexpired leases to which any of the Debtors is a party, to the extent such contracts or leases are executory contracts or unexpired leases, *shall be rejected by the Debtors on the Confirmation Date*, unless such contract or lease (a) previously shall have been assumed or rejected by the Debtors . . . (b) is the subject of a pending motion to assume or (c) shall have expired or terminated pursuant to its own terms . . . .

(emphasis added). The Debtor's second amended plan of liquidation, filed on December 20, 2002, provided:

### Introduction
**The Plan provides for the liquidation and conversion of all the Debtors' assets to cash and the distribution of the net proceeds realized therefrom.**

* * *
### Article VII

### TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

7.1    ***Rejected Contracts and Leases***. Except as otherwise provided in the Plan . . . each of the executory contracts to which any of the Debtors is a party, to the extent such contracts or leases are executory contracts or unexpired leases, shall be rejected by the Debtors on the Confirmation Date, unless such contract or lease previously (a) shall have been assumed or rejected by the Debtors (including, but not limited to, those executory contracts and unexpired leases assumed by and assigned to the Buyers), (b) is the subject of a pending motion to assume, or (c) shall have expired or terminated pursuant to its own terms . . . . The Confirmation Order shall constitute an order of the Bankruptcy Court approving the rejections described in this Article VII,

11

pursuant to section 365 of the Bankruptcy Code, as of the Confirmation Date.

The notice of the Debtor's Disclosure Statement, second amended plan and the scheduled hearing on confirmation of the plan (the "Confirmation Hearing") did not include a full text copy of either the Disclosure Statement or the plan. It did, however, contain this Court's order approving the Disclosure Statement, alert interested parties to the pending Confirmation Hearing and explain to the recipients that copies of the Disclosure Statement, the plan and the solicitation procedures order were available on request. The Affidavit of Service with respect to the notice shows that it was served on Interliance and WEST, but was not served on the University, EEA or Kinnetic.

On February 14, 2003, this Court entered an order (the "Confirmation Order") confirming the Debtor's Modified Second Amended Plan of Liquidation (the "Plan"). The Plan became effective on February 25, 2003 pursuant to Article IX, and Stephen S. Gray was appointed the Plan Administrator of Dehon pursuant to the Plan and Confirmation Order. Notice of the Confirmation Order was served on Interliance and WEST, but not the University, EEA or Kinnetic.

In January and February of 2004, the Plan Administrator commenced the present adversary proceedings seeking avoidance and recovery of prepetition payments made to each of the Defendants, pursuant to §§ 547 and 550 of the Bankruptcy Code. Each of the Defendants filed an answer arguing, in part, that the preference actions could not be maintained since each of the contracts had been assumed by the Debtor or should now be ordered assumed, retroactive to the date of the Sale. The Plan Administrator has moved for summary judgment on this defense, and the Defendants have filed cross-motions for

summary judgment.  The Plan Administrator has also filed motions to strike portions of the

Defendants' affidavits filed in support of their summary judgment motions (the "Motions to

Strike"),[11]  to which the Defendants each timely filed a response.


II.    POSITIONS OF THE PARTIES

       The parties agree with the general proposition that a non-debtor party to an

assumed executory contract cannot be sued to recover pre-petition payments as

preferential payments, since a party to an assumed contract is entitled to full cure of all

defaults prior to assumption.[12]  The parties dispute, however, whether the Defendants'

contracts were assumed and, if not, whether this Court should now order a retroactive

assumption of the contracts.

       The Plan Administrator argues that the Defendants' contracts have not been

assumed.  He points to the absence of any motion to assume the Defendants' contracts

and the fact that neither TIAX nor ICF identified the Defendants' contracts  to be assumed

and assigned in connection with the Sale.  He also emphasizes the fact that this Court

never entered an order approving the assumption of the Defendants' contracts.  Relying

on case law standing for the proposition that assumption of an executory contract can only

be accomplished by court approval, he argues that, as a matter of law, no assumption of

---

[11] In addition to the Motions to Strike filed in each case, the Plan Administrator also filed an
opposition to and motion to strike portions of the statement of genuine issues of fact filed by the
University of Alaska. Because the same arguments are raised in that opposition, the request to
strike portions of the statement will be considered in conjunction with the other Motions to Strike.

[12] See Discussion Part III.C., infra.

the Defendants' contracts has taken place.  Furthermore, the Plan Administrator maintains that the Defendants' contracts were all successfully rejected through the Plan.

The Defendants first dispute the Plan Administrator's assertion that the Debtor's Plan effected a rejection of their contracts.  As to those parties who received no notice of the Plan, the Defendants say the rejection provisions of the Plan cannot bind them consistent with Constitutional due process requirements.  Thus, there was no effective rejection of their contracts.  The Defendants further argue that, even with proper notice, the Plan could not effectively reject the Defendants' contracts; since they contend that "boilerplate" language of rejection in a Chapter 11 plan is insufficient to reject an executory contract under § 365.

Moreover, the Defendants argue, the Sale Motion and Sale Order effectively worked an assumption of their contracts.  Because § 365 requires the assumption of executory contracts before they may be assigned to third parties, the Defendants say the sale of their contracts required assumption.  Relying on the proposition that the contracts were not property of the estate absent assumption, the Defendants conclude that they could not have been sold until they were assumed.  They maintain that the failure of the Debtor to formally assume the contracts was mere "oversight," and that the Debtor intended to assume the contracts, but simply neglected to file the appropriate motion to do so.  They also posit that the value the estate received from the Sale reflected the value of the Defendants' contracts as if they were being assumed and assigned pursuant to § 365. Accordingly, say the Defendants, the Court should rule that the contracts were assumed by virtue of the Sale Order.

14

The Defendants further argue that even if the contracts were not functionally assumed by virtue of the Sale, this Court should order the retroactive assumption of the contracts as a remedy for the lack of notice they received regarding the Sale.  The Defendants maintain that they were prejudiced by this lack of notice, because they were deprived of the opportunity to assert their rights before this Court and with the buyers.  Had they known of the terms of the Sale, they argue, they would have demanded that their contracts be formally assumed before proceeding to perform for the buyers.  And, since they had no notice of the Sale, they had no opportunity to refuse to performance in exchange for formal assumption of their contracts.  They also assert that had they demanded the assumption of their contracts, their contracts most certainly would have been assumed given the circumstances of the case.

Finally, the Defendants argue that the Plan Administrator is judicially estopped from pursuing this avoidance action because he has taken inconsistent positions regarding the assumption of the contracts.  The Defendants say that, throughout the Sale process, the Debtor acted as though it intended to assume the Defendants' contracts and, in fact, received a higher sale price based on those representations.  Accordingly, say the Defendants, the Plan Administrator cannot bring the preference actions against them now as if the contracts were not assumed.

In response, the Plan Administrator acknowledges that there appear to be deficiencies in the notice provided to the parties of the Sale and the Plan.  According to the Plan Administrator, however, that lack of notice does not warrant an order compelling the assumption of the contracts retroactive to the date of the Sale Order.  At most, he argues,

15

the Defendants should be granted an extension of the bar date for filing claims arising from the rejection of their contracts, because they failed to receive notice of that rejection.

In fact, the Plan Administrator says, any insufficiency of notice would give rise to an inference that the Defendants' contracts could *not* have been assumed in connection with the Sale, since parties to executory contracts are entitled to notice of assumption and alleged cure amounts before court approval of the assumption and before the assumption will be deemed effective. Absent the appropriate notice, a purported assumption is not valid.

The Plan Administrator says that the Defendants chose to continue to perform on the contracts after having received notice that the Debtor was no longer a participating party. They chose not to inquire further into the ability of the buyers to force performance, but continued to perform in return for payments from TIAX and ICF. If the Defendants are unhappy with the way the buyers managed the contracts, the Plan Administrator maintains, such disputes are unrelated to the bankruptcy estate.

The Plan Administrator also asks this Court to strike the portions of the Defendants' affidavits wherein they state what they "would have done" had they received proper notice of the Sale. He argues that the statements are "speculative and/or immaterial or [ ] otherwise constitute inadmissible legal conclusions." The Defendants counter that such "what we would have done if we had known statements" are probative, material and, citing to a variety of cases, widely allowed.

III.     DISCUSSION

     A.     **Summary Judgment Standard**

16

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  "A 'genuine' issue is one 'that properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party,'" Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994), and an issue is "material" if it "affects the outcome of the suit." Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990); see also Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

## B.    Motions to Strike

Federal Rule of Civil Procedure 56(e), made applicable to these proceedings by Bankruptcy Rule 7056, provides, in the context of summary judgment motions:

> Supporting and opposing affidavits shall be made on personal knowledge, *shall set forth such facts as would be admissible in evidence*, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. . . .

The Plan Administrator has argued that the Defendants' assertions regarding what they would have done had they received proper notice of the Sale are not admissible facts, as they are speculative or immaterial. This Court, however, agrees with the Defendants that the speculative nature of the statements does not render them *per se* inadmissible. Moreover, the materiality of the statements "is a question to be decided in this action and not one that may be avoided by the simple expedient of striking from the record any factual assertions made with respect to the issue before the substance of the question is

17

considered." Esancy v. Vt. Mutual Ins. Co., 2003 WL 22282166, *2 (Oct. 2, 2003). The

Motions to Strike will accordingly be DENIED.

### C.    Executory Contracts and the Bankruptcy Code

"[G]eneral principles governing contractual benefits and burdens do not always apply

in the bankruptcy context," Data-link Sys., Inc. v. Whitcomb & Keller Mortgage Co., Inc. (In

re Whitcomb & Keller Mortgage Co., Inc.), 715 F.2d 375, 379 (7th Cir. 1983), and this is

especially true in relation to the treatment of executory contracts pursuant to § 365 of the

Bankruptcy Code. Once a debtor files for bankruptcy, the rights of non-debtor parties to

executory contracts with the debtor are modified by the Code. See 11 U.S.C. § 365; In re

El Paso Refinery, 220 B.R. 37, 45 (Bankr. W.D. Tex. 1998) ("Bankruptcy intervenes to

affect the property of the non-debtor party [to an executory contract], just as it intervenes

to affect the rights of *all* unsecured creditors with claims against the estate.").

One of the of the most powerful tools in the Chapter 11 debtor-in-possession's[13]

bankruptcy tool kit is the ability to, subject to court approval, "assume or reject any

executory contract." 11 U.S.C. 365(a), (d)(2); Eagle Ins. Co. v. Bankvest Capital Corp. (In

re Bankvest Capital Corp.), 360 F.3d 291, 296 (1st Cir. 2004); Thinking Machs. Corp. v.

Mellon Financial Services Corp. (In re Thinking Machs. Corp.), 67 F.3d 1021, 1024 (1st Cir.

1995); Pub. Serv. Co. of N.H. v. N.H. Elec. Coop., Inc. (In re Pub. Serv. Co. of N.H.), 884

F.2d 11, 15 (1st Cir. 1989); Century Indem. Co. v. NGC Settlement Trust (In re Nat'l

---

[13] Section 365 of the Bankruptcy Code refers to the trustee. However, under 11 U.S.C. § 1107, a Chapter 11 debtor-in-possession exercises essentially the same rights as a trustee, including rights vis-a-vis its executory contracts. Because this is a Chapter 11 case, further references to the "debtor's" rights will refer to the rights of a debtor-in-possession, and not the rights of all debtors under the Code.

Gypsum Co.), 208 F.3d 498, 505 (5th Cir. 2000).[14]   Once a contract is assumed, it will

continue to operate according to its terms.   In re Pub. Serv. Co. of N.H., 884 F.2d 11 at 14.

If the contract is rejected, the rejection gives rise to a claim for damages as if the contract

had been breached pre-petition.   11 U.S.C. § 502(g); N.L.R.B. v. Bildisco & Bildisco, 465

U.S. 513, 531 (1984); In re Pub. Serv. Co. of N.H., 884 F.2d at 14-15.   "The 'claim' created

by the rejection of the contract . . . is then afforded treatment similar to all other unsecured

claims that are either provided for in the plan or are discharged through § 1141(d)."   In re

Nat'l Gypsum Co., 208 F.3d at 505.

        This powerful tool is not without limits, however.   First, there is a temporal limit.   In

a Chapter 11 case, the decision to assume or reject (except as to nonresidential property

leases) must be made prior to or in conjunction with a confirmed plan.   11 U.S.C. §

365(d)(2).   Second, parties to the contract must be given adequate notice of the proposed

rejection or assumption.[15]   Notice is required not only to provide the non-debtor parties to

---

        [14] As the Fifth Circuit noted in In re National Gypsum Co., although the non-debtor party to
an executory contract may file a motion to have the debtor make the assumption/rejection decision
earlier than the time limits ordinarily imposed by § 365, see 11 U.S.C. § 365(d)(2), "other than this
limited ability to prompt a decision, the non-debtor is without power over the assumption [or
rejection] process." 208 F.3d at 506.

        [15] Pursuant to Federal Rule of Bankruptcy Procedure (the "Bankruptcy Rules" or the "Rules")
6006, "[a] proceeding to assume, reject, or assign an executory contract, other than as part of a
plan, is governed by Rule 9014." Rule 9014, in turn, mandates that "relief be requested by motion,
and reasonable notice and opportunity for hearing shall be afforded the party against whom relief
is sought." Rule 6006 also requires notice of such a motion to "be given to the other party to the
contract or lease . . . ." And, although Rule 6006 speaks of proceedings to assume or reject *other
than as part of a plan*, it is clear that the assumption or rejection of executory contracts through a
Chapter 11 Plan, see 11 U.S.C. 1123(b)(2), while not necessitating a separate *motion* as required
by Rule 9014, must still be noticed properly. Thus, those parties whose executory contracts will be
either assumed or rejected through a plan are entitled to notice of that intent. In re Nat'l Gypsum,
208 F.3d at 512-13; Lifeline Commc'ns, Inc. v. Amerivision Commc'ns, Inc. (In re Amerivision
Commc'ns, Inc.), -- B.R --, 2006 WL 2422662, *3-4 (B.A.P. 10th Cir. Aug. 23, 2006).

19

executory contracts an opportunity to raise objections to the proposed treatment of their

contracts, but also to allow them to appropriately assert claims arising from rejection, see,

e.g., In re Parkwood Realty Corp., 157 B.R. 687, 691 (Bankr. W.D. Wash. 1993), or, in the

case of assumption, to assert the amount required to cure any default.  See, e.g., In re Nat'l

Gypsum, 208 F.3d at 513. Failure to provide the appropriate notice may result in the court

finding the assumption or rejection to be invalid.  See, e.g., S. St. Seaport Ltd. P'ship v.

Burger Boys, Inc. (In re Burger Boys, Inc.), 94 F.3d 755, 763 (2d Cir. 1996) (order

approving assumption vacated where non-debtor party not provided appropriate notice and

opportunity to be heard); In re Parkwood, 157 B.R. at 691 (no effective rejection of contract

through plan where non-debtor party did not receive notice).

If the debtor proposes to assume an executory contract, additional requirements

must be met.  First and foremost, in order to assume the contract, the debtor must "cure,

or provide[ ] adequate assurance that [debtor] will promptly cure" any default under the

contract. 11 U.S.C. § 365(b)(1); In re Bankvest, 360 F.3d at 296; In re Superior Toy & Mfg.

Co., 78 F.3d 1169, 1174 (7th Cir. 1996) (pre- and post-petition payments due under

contract must be paid in order to assume an executory contract).[16] Since "the creditor must

perform in accordance with the terms of the assumed agreements . . . , as a matter of

fairness . . . , courts require the debtor in possession to 'give [ ] the other contracting party

the full benefit of [its] bargain."  Kimmelman v. The Port Auth. of N.Y. & N.J. (In re Kiwi Int'l

---

[16] There are other limits on the debtor's (or the trustee's) ability to assume a contract, none
of which are particularly relevant here.  For instance, the debtor must provide adequate assurance
of future performance under the contract, 11 U.S.C. § 365(b)(1)(C), and the debtor may not assume
an executory contract where "applicable law excuses a party . . . from accepting performance from
. . . an entity other than the debtor . . . [and] such party does not consent to such assumption." 11
U.S.C. § 365(c)(1).

Air Lines, Inc.), 344 F.3d 311, 318 (3d Cir. 2003) (quoting H.R. Rep. No. 95-595, at 348

(1997), reprinted in 1978 U.S.C.C.A.N. 5963, 6304-05).

Finally, although the business decision is largely within the debtor's discretion, only

the court can approve the debtor's proposed assumption.  11 U.S.C. § 365(a). It is well-

established that the doctrine of "implied assumption" has little, if any, merit.  See, e.g.,

Mason v. Official Comm. of Unsecured Creditors (In re FBI Dist. Corp.), 330 F.3d 36, 45

(1st Cir. 2003); In re Thinking Machs., 67 F.3d at 1026-27; Univ. Med. Ctr. v. Sullivan (In

re Univ. Med. Ctr.), 973 F.2d 1065, 1077 (3d Cir. 1992); In re Whitcomb, 715 F.2d at 380;

In re The IT Group, 322 B.R. 729, 736 (Bankr. D. Del. 2005); Newman Grill Sys., LLC v.

Ducane Gas Grills (In re Ducane Gas Grills, Inc.), 320 B.R. 34, 351-52 (Bankr. S.D.S.C.

2004); United Food & Commercial Workers Union v. Family Snacks, Inc. (In re Family

Snacks, Inc.), 257 B.R. 884, 904 (B.A.P. 8th Cir. 2001); In re Swallen's, Inc., 210 B.R. 120,

122 (Bankr. S.D. Ohio 1997) ("There is no room in the bankruptcy scheme for assumption

of an executory contract by implication."); In re Gunter Hotel Assocs., Inc., 96 B.R. 696, 701

(Bankr. W.D. Texas 1988); In re A.H. Robins Co., 68 B.R. 705, 708-11 (Bankr. E.D. Va.

1986).  Even where the non-debtor party to a contract continues to provide services under

the contract and the debtor continues to accept the benefits of such performance, the

contract will not be considered to have been assumed absent an order of the court

approving the assumption.  In re Whitcomb, 715 F.2d at 379-80; In re Ducane Gas Grills,

320 B.R. at 351-52; Houbigant, Inc.v. ACB Mercantile, Inc. (In re Houbigant, Inc.), 188 B.R.

347, 355-56 (Bankr. S.D.N.Y. 1995); In re A.H. Robins, 68 B.R. at 710.

As the First Circuit has noted, strict adherence to the requirement for court approval

before a rejection or assumption will be effective is not mere form:

21

> Congress enacted section 365(a) as part of the Bankruptcy Code of 1978,
> making court approval of [executory contract rejection or assumption]
> obligatory for the first time. . . . The predecessor to section 365(a), section
> 70(b) of the Bankruptcy Act of 1898, and the applicable bankruptcy rule
> governing actions taken pursuant to section 70(b), did not explicitly require
> judicial approval [of assumption or rejection decisions]. . . . In adopting a
> requirement of court approval, Congress overruled precedent that allowed
> trustees to show by informal conduct that they had either assumed or
> rejected [executory contracts]. . . .

In re Thinking Machs., 67 F.3d at 1026, 1027 (citations omitted); see also In re A.H. Robins

Co., 68 B.R. at 708 ("Court approval plays much more than the perfunctory role . . . . To not

follow the rather explicit rules laid out by Congress would be to lead the courts back into

the morass of attempting to judge the meaning of the conduct and conversations of the

parties.").

Finally, this Court notes what some courts have considered a "third option" – *ride-*

*through*. The ride-through doctrine "is purely a creature of case law." In re Hernandez, 287

B.R. 795, 799 (Bankr. D. Az. 2002).  It has arisen largely in cases where, through

presumed oversight, the debtor neglected to appropriately assume or reject a contract prior

to confirmation of the Chapter 11 plan.  Ride-through does not equate to rejection, and it

"is not a *de facto* assumption."  In re Hernandez, 287 B.R. at 800-801.  Instead, in such

cases, the contract is generally treated as through it passes through the bankruptcy

process unaffected.  See, e.g., In re Pub. Serv. Co. of N.H., 884 F.2d at 15; In re

Hernandez, 287 B.R. at 799-800; In re Family Snacks, 257 B.R. at 905; Texaco Inc. v. Bd.

of Comm'rs for the LaFourche Basin Levee Dist. (In re Texaco Inc.), 254 B.R. 536, 557-58

(Bankr. S.D.N.Y. 2000); In re Cajun Elec. Power Coop., Inc., 230 B.R. 715, 734-35 (Bankr.

M.D. La. 1999); Polysat, Inc. v. Union Tank Car Co. (In re Polysat, Inc.), 152 B.R. 886, 890

(Bankr. E.D. Pa. 1993); Cent. Control Alarm Corp. v. Black (In re Cent. Watch, Inc.), 22

22

B.R. 561 (Bankr. E.D. Wisc. 1982).  And, since the contract is "unaffected," by the bankruptcy, non-debtor contracting parties may then seek redress for defaults under the contract outside the bankruptcy proceedings.  See, e.g., In re Hernandez, 287 B.R. at 807; In re Texaco, 254 B.R. at 558-59; In re Polysat, 152 B.R. at 891; Cont'l Country Club, Inc. v. Burr (In re Cont'l Country Club, Inc.), 114 B.R. 763, 768 (Bankr. M.D. Fla. 1990).

**D.      § 547 and Assumption Under § 365: The "Superior Toy" Defense**

In order to ensure the equal treatment of a debtor's creditors, the Bankruptcy Code allows a trustee (or, as here, a duly appointed Plan Administrator) to avoid and recover payments made to creditors within a short period of time (90 days for most creditors, one year for the debtor's insiders) preceding the commencement of the bankruptcy case.  11 U.S.C. § 547(b); 11 U.S.C. § 550.  Such preferential payments disrupt the distribution scheme under the Code and "the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor.  Any creditor that received a greater payment than others of its class is required to disgorge so that all may share equally."  Resnick & Summer, Collier on Bankr. (15th Ed. Rev.), ¶ 547.01 (2006).

In addition to statutory defenses found in § 547(c), a defendant may also be insulated from returning otherwise preferential payments when those payments were made pursuant to a contract that has been assumed.  As the Seventh Circuit Court of Appeals explained in In re Superior Toy & Manufacturing Co., "[the avoidance and recovery of preferences under] section 547 and [assumption] under § 365 are mutually exclusive avenues for a trustee. A trustee may not prevail under both," 78 F.3d 1169, 1175 (7th Cir. 1996).

> An assumption order pursuant to § 365 distinguishes the contracting party
> from other creditors.  The contracting party is forced to continue to do
> business with the debtor.  In exchange, the contracting party is entitled to
> payment of all amounts due him under the contract up until the time of the
> order. . . . [T]he payments . . . are not preferential because the contracting
> party is entitled to 100 percent of his claim.  Alvarado v. Walsh (In re LCO
> Enterprises), 12 F.3d 938, 941 (9th Cir. 1993).

Id. at 1172; see also Kimmelman v. The Port Auth. of N.Y. & N.J. (In re Kiwi Int'l Air Lines),

344 F.3d 311 (3d Cir. 2003); Alberts v. Humana Health Plan (In re Greater Se. Cmty. Hosp.

Corp.), 327 B.R. 26 (Bankr. D.C. 2005); Philip Servs. Corp. v. Luntz (In re Philip Servs.

(Del.), Inc.), 284 B.R. 541 (Bankr. D. Del. 2002).

In the present case, the Defendants argue that (1) their contracts have been

assumed by the Debtor; or (2) this Court should order the assumption of the Defendants'

contracts, retroactive to the date of the sale.  Thus, how the Defendants will fare depends

in large part on whether their contracts have been assumed.[17]  If the contracts are not

assumed, the contracting parties are subject to § 547(b).  If the contracts are assumed, the

Defendants are entitled to receive all amounts in arrears and the preference actions cannot

be maintained.  See Superior Toy, 78 F.3d at 1172.

### E.    Analysis

#### 1.    Assumption via the Sale

---

[17] Although both parties have briefed the issue, the question of whether the Defendants'
contracts were rejected through the confirmation of the Plan is essentially irrelevant to the issues
before the Court.  The Defendants base their arguments on the circumstances surrounding the
Sale, which was consummated approximately one year prior to Plan Confirmation.  If, as the
Defendants argue, the Sale Order effected an assumption of their contracts, the Plan, by its own
terms, could not have rejected those contracts.  Thus, for the purpose of determining whether the
Defendants' § 365 assumption defense is viable, the question is not whether the contracts were
rejected, but whether the contracts were assumed.  The rejection question is therefore presently
irrelevant, since an ineffective rejection does not amount to an assumption.  See, e.g., United Food
& Commercial Workers v. Family Snacks, Inc. (In re Family Snacks, Inc.), 257 B.R. 884 (B.A.P. 8th
Cir. 2001).

Under First Circuit case law and the view of the overwhelming majority of courts from other jurisdictions, the Defendants' contracts were not assumed, as there has been no request for, and no court approval of, an assumption of their contracts.  See Mason v. Official Comm. of Unsecured Creditors (In re FBI Dist. Corp.), 330 F.3d 36, 45 (1st Cir. 2003) ("the plain text of section 365 requires express approval by the court"); Thinking Machs. v. Mellon Fin. Servs. Corp. (In re Thinking Machs.), 67 F.3d 1021, 1025-27 (1st Cir. 1995).  The Defendants, however, attempt to avoid this conclusion by arguing that the Sale Order operated as an order approving the assumption and assignment of the Defendants' contracts.

The Defendants would analogize this case to Chbat v. Tleel (In re Tleel), where the Ninth Circuit Court of Appeals held that a bankruptcy court's order permitting the sale of real property acquired under a land-sale contract and "the formal actions taken in bankruptcy court by the debtor-in-possession acting as trustee, and later by the Trustee, to obtain permission to sell the Property free and clear of all liens and to obtain an order authorizing foreclosure constituted an adequate assumption [of the land-sale contract] with sufficient notice."  876 F.2d 769, 771 (9th Cir. 1989).  Under First Circuit case law, however, by which this Court is bound, an assumption cannot be implied, but requires court approval. In re FBI Dist. Corp., 330 F.3d at 45; In re Thinking Machs., 67 F.3d at 1025-27.

Even assuming the result in Tleel could be made consistent with First Circuit case law, the facts of Tleel  are readily distinguishable.  There, the motion to sell involved only one contract, clearly identified in the motion and order, and all appropriate parties received notice of relevant motions and the court order authorizing the sale. 876 F.2d at 769-70.  In contrast, the Sale Motion in this case did not identify any contracts to be assumed, and

25

most certainly did not identify the Defendants' contracts.  And, although the TIAX and ICF Agreements listed "contracts" as part of the assets to be transferred, neither TIAX nor ICF identified any of the Defendants' contracts as those to be assumed and assigned in conjunction with the Sale.  Under these circumstances, the Sale Order itself could not be interpreted to have approved the assumption of the Defendants' contracts.

The Defendants further argue that the Sale Order must have authorized the assumption of the Defendants contracts, because, absent assumption, the Debtor had no interest in the property to sell.  And, since the Defendants claim that TIAX and ICF paid for the contracts *as if they had been assumed*, they argue that it would be inequitable to allow the estate a "double recovery" through the purchase price and the avoidance of the preferential transfers.

Portions of this argument find support in the Bankruptcy Code and in case law. For instance, pursuant to § 365(f)(2):

> The trustee may assign an executory contract or unexpired lease of the debtor only if –
>
> (A)     *the trustee assumes such contract* or lease in accordance with the provisions of this section; and
>
> (B)     adequate assurance of future performance by the assignee of such contract or lease is provided . . . .

11 U.S.C. § 365(f)(2) (emphasis added).  Thus, the court in <u>Otto Preminger Films Ltd. v. Qintex Entertainment, Inc. (In re Qintex Entertainment, Inc)</u> held that the sale of estate assets would not include any executory contract that had not been assumed. 950 F.2d 1492, 1495 (9th Cir. 1991).  Relying on <u>Qintex</u>, the court in <u>In re Access Beyond Technologies, Inc.</u> denied a motion to sell pursuant to § 363, since included among the

26

assets to be sold were rights under a licensing agreement that the court had earlier found

to be unassignable pursuant to § 365.  237 B.R. 32, 47 (Bankr. D. Del. 1999).  The <u>Access</u>

<u>Beyond</u> court held that the provisions of § 365 could not be circumvented by characterizing

the sale as one solely under § 363, since "the buyer may be purchasing an illusion: the

executory contract will disappear on conclusion of the bankruptcy case."  <u>Id.</u> at 47-48.

But the Defendants here miss the mark for two reasons. First, in <u>Qintex</u> and <u>Access</u>

<u>Beyond</u>, it was clear that the sellers intended to sell, and the buyers were attempting to

buy, *enforceable* rights in the contracts at issue.  Without an assumption of the contracts,

which is *the* mechanism for a trustee or debtor to secure enforceable rights against the

non-debtor contracting party, they could not assign any enforceable rights to a third party.

In the present case, however, there is no indication that either the Debtor or the

buyers believed they were dealing with contracts enforceable against the contracting

parties pursuant to the § 365 assumption process.  The TIAX and ICF Agreements

purported only to sell whatever rights the Debtor had in the contracts.  Presumably, if the

Debtor had no rights to enforce the contracts against the non-debtor contracting parties,

then the buyer could not purchase enforceable rights against them.  The Agreements also

clearly stated that the transactions were "as is" transactions, and that there were no

guarantees that the non-debtor third parties would continue to perform on the contracts.

Second, the argument that the Plan Administrator is seeking a "double recovery"

through the preference actions fails for similar reasons.  There is no indication in the sale

documents that the purchase price was adjusted to reflect the enforceability of any contract

transferred from the Debtor to the buyers.  In fact, the contrary conclusion must be drawn

from the Agreements and the mechanics of the sale – it was the *buyers*, TIAX and ICF,

who had the option of designating contracts to be assumed.  It cannot be argued now that they paid value for assumed contracts they expressly chose *not* to have assumed.

Finally, even if this Court were inclined to inquire into whether the value paid by the buyers reflected the true value of what they received (which it most certainly is *not* prepared to do in the context of the present motions), it is questionable whether the Defendants are the proper parties to raise this argument.  See, e.g., U.S. Dept. of Labor v. Triplett, 494 U.S. 715, 720 (1990) ("Ordinarily, of course, a litigant "'must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" (quoting Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc., 454 U.S. 464, 474 (1982); Warth v. Seldin, 422 U.S. 490, 499 (1975)).

### 2.    Assumption as a Remedy for Lack of Notice

Three of the Defendants, the University, EEC and Kinnetic, received no notice of relevant events in the Debtor's bankruptcy case. Two of the Defendants, Interliance and WEST, did receive the Sale Notice and the notice of the Disclosure Statement, Plan and Confirmation Hearing, but claim that notice to them may  not have been sufficient under the Bankruptcy Code and Rules.

Assuming, without deciding, that none of the Defendants received adequate notice of the Sale, the question is whether this Court should now, as a remedy for the deficient notice, order the contracts assumed retroactive to the date of the Sale.  The Defendants argue that this Court should exercise such an extraordinary remedy, because they were deprived of the opportunity to assert and protect their rights throughout the sale process. In their motions and associated affidavits, each defendant vehemently argues that, had it been aware of the Debtor's proposed treatment of its contract, it would have forced the

28

Debtors to assume the contract, or would have forced the buyers to designate the contract

for assumption, before continuing to perform.

The First Circuit has intimated that there may be an appropriate circumstance where

a court could exercise its equitable powers under § 105(a)[18] to approve the rejection of a

nonresidential lease under § 365(a) retroactive to the date of the filing of the motion to

reject.  In re Thinking Machs., 67 F.3d at 1028.  This holding, however, does not give

bankruptcy courts *carte blanche* to order contracts assumed (or rejected) retroactively.  The

Thinking Machines court cautioned that the

> equitable powers of bankruptcy courts are not unlimited.  They can only be
> brought to bear in the service of the Bankruptcy Code.  Thus, a bankruptcy
> court's exercise of its residual equitable powers must be connected to, and
> advance the purposes of, specific provisions in the Code. . . . *[A] retroactive*
> *order may be appropriate as long as its promotes the purposes of section*
> *365(a).*

Id. (emphasis added) (citations omitted).

Neither the Debtor nor the Plan Administrator has ever requested the assumption

of the Defendants' contracts.  The plain language of § 365 places the power to make

assumption/rejection decisions solely within the hands of the trustee or debtor-in-

possession.  The court's only role in the process is to approve (or disapprove) a request

to assume or reject or, at the request of a non-debtor party to a contract, to order the

trustee or debtor to make the decision within a certain time frame.  11 U.S.C. § 365(a).

---

[18] That section provides:
The court may issue any order, process, or judgment that is necessary or
appropriate to carry out the provisions of this title.  No provision of this title providing
for the raising of an issue by a party in interest shall be construed to preclude the
court from, sua sponte, taking any action or making any determination necessary
or appropriate to enforce or implement court orders or rule, or to prevent an abuse
of process.
11 U.S.C. § 105(a).

29

Nothing in the Code suggests that the court has the power to force the assumption of a contract against the will of the trustee or debtor-in-possession.  "The Bankruptcy Code places the option of assuming or rejecting executory contracts with the debtor, not with its business partners," and, presumably, not with the bankruptcy courts.  Pub. Serv. Co. of N.H. v. N.H. Elec. Coop., Inc. (In re Pub. Serv. Co. of N.H.), 884 F.2d 11, 15 (1st Cir. 1989).[19]   Thus, this Court rejects the Defendants' contention that it may force the retroactive assumption of the Defendants' contracts.  See In re A.H. Robins Co., Inc., 68 B.R. 705, 710 (Bankr. E.D. Md. 1986) ("The debtor-in-possession having expressed its preference under § 365, the non-debtor party . . . cannot distort the purposes of a statutory provision designed to benefit the reorganizing process by requesting the Court to enter an order in direct contravention of the debtor's expressed desire.").

For much the same reason, this Court finds immaterial the Defendants' contention that, had they been given notice of the Sale, they would have been successful in persuading the Debtor to assume their contracts or the buyer to designate them for assumption.  Despite having access to records evidencing the existence of the Defendants' contracts, neither the Debtor nor the buyers decided to request their assumption. Dozens of contracts were affected by the sales of the business lines to TIAX and ICF, and yet only one contract – an unexpired real property lease – was designated by TIAX for assumption,

---

[19] Although the court must review the trustee's or debtor's decision regarding assumption or rejection of an executory contract or unexpired lease, it has long been recognized that the initial determination lies squarely with the trustee or debtor and this power is essential for successful reorganization.  See, e.g., N.L.R.B. v. Bildisco & Bildisco, 465 U.S. 513, 528 (1977); Century Indem. Co. v. NGC Settlement Trust (In re Nat'l Gypsum Co.), 208 F.3d 498, 505-506 (5th Cir. 2000); In re FBI Dist. Corp., 330 F.3d 36;  In re Pub. Serv. Co. of N.H., 884 F.2d at 15; In re A.H. Robins, 68 B.R. at 710; In re Westview 74th St. Drug Corp., 59 B.R. 747, 754 (Bankr. S.D.N.Y. 1986).

and ICF designated none.   Given the language of the TIAX and ICF Agreements characterizing the transactions as "as is" transfers of assets "with all faults," it seems clear that the buyers were not primarily concerned with the rights attendant to contracts assumable pursuant to the Bankruptcy Code.   Rather, using the information obtained from the Debtor's records, they appeared to be taking their chances that the non-debtor parties to contracts would continue to perform under the contracts in the interest of receiving ongoing compensation for their services.

Even were this Court to accept the "ride-through doctrine,"[20] the ruling on the present summary judgment motions would be unaffected.   The basic premise of the ride-through doctrine is that the contract, because it was not dealt with pursuant to the Bankruptcy Code, is simply *unaffected* by the bankruptcy.   The rights and obligations of a party to contract that has ridden through are therefore very different from a party whose contract has been assumed.   Where a contract has been assumed, the debtor can force performance or may assign the contract even in the face of *ipso facto* or anti-assignability clauses.   See, e.g., 11 U.S.C. § 365(e), (f).   In return, the non-debtor party is entitled to compensation, *from the bankruptcy estate*, for all monetary defaults under the contract. In contrast, where a contract rides through the bankruptcy, the non-debtor contracting party is *not* entitled to have all pre-petition defaults cured by the bankruptcy estate, since "the non-bankrupt party to the executory contract is not a creditor with a provable claim against the bankrupt estate."   Id. at 801 n.8 (quoting In re Cochise College Park, Inc., 703 F.2d

---

[20] Indeed, in one sense, that judicially created vehicle seems inapplicable here – since there is no reorganized debtor, there is no entity for the contract to ride-through *to*.  See, e.g., Cajun Electric Power Cooperative, 230 B.R. 715, 735 (Bankr. M.D. La. 1999)

1339, 1352 (9th Cir. 1983)); see also In re Pub. Serv. Co. of N.H., 884 F.2d at 15 (where

contract had not been assumed or assigned, non-debtor contracting party "has no provable

claim against estate").   Moreover, even if the Defendants' contracts passed through the

bankruptcy process and were not effectively rejected, their continued performance was *not*

rendered to the bankruptcy estate, but to the buyers.  Simply put, since their contracts have

not been assumed, the Defendants, like many other parties who received pre-petition

payments from the Debtor, are subject to the preference avoidance provisions of § 547.

Finally, a general lack of notice of the events in a debtor's bankruptcy case does not

bar a trustee or plan administrator from seeking to recover preferential transfers from the

transferee.  See, e.g., Langenkamp v. Hackler (in re Republic Trust & Sav Co.), 897 F.2d

1041 (10th Cir. 1990), rev'd. on other grounds sub nom. Langenkamp v. Culp, 498 U.S. 42

(1990); Duvoisin v. Anderson (In re S. Indus. Banking Corp.), 88 B.R. 174, 177 (Bankr. E.D.

Tenn. 1987). The Defendants correctly note that this Court (as well as many others) has

held that the Due Process Clause of the Fifth Amendment to the United States Constitution

requires notice and an opportunity to be heard before a creditor's claim may be adversely

affected by the operation of the federal bankruptcy laws.  In re Arch Wireless, 332 B.R.

241, 251 (Bankr. D. Mass. 2005).  But the Arch holding is largely inapposite, since the Plan

Administrator is not attempting to bar the Defendants from asserting a claim *against* the

bankruptcy estate but is instead attempting to recover a claim *on behalf of* the bankruptcy

estate.

In a case involving preference actions initiated by a trustee in bankruptcy against

parties who had received no prior notice of the bankruptcy proceedings, the Tenth Circuit

Court of Appeals held that the lack of notice of events in the bankruptcy case did not bar

the trustee's adversary proceedings to recover preferential payments. <u>Langenkamp</u>, 897

F.2d 1041. The <u>Langenkamp</u> court noted that the creditors simply *had no claim* against the

bankruptcy estate unless and until the trustee was successful in recovering the payments.

<u>Id.</u> at 1046.  Thus, "any deprivation of property will occur in the trustee's proceedings to

avoid the allegedly preferential transfers.  Appellants have received ample notice and

opportunity to be heard in these adversary proceedings." <u>Id.</u>; <u>see also</u> <u>Duvoisin</u> , 88 B.R.

174 (parties who had received no notice of events in bankruptcy case were still subject to

suit under § 547, since there was no "taking" of the defendants' property until judgment

entered against them and "the adversary proceedings . . . afforded more than adequate

notice and an opportunity to be heard . . . .").

Similarly, in the context of the present adversary proceedings, the property at issue

(namely, the pre-petition payments made to the Defendants) will only be "taken" in the

constitutional sense in the event the Plan Administrator is successful in proving his case.

And, like the defendants in both <u>Langenkamp</u> and <u>DuVoisin</u>, the Defendants have received

ample notice of the preference actions and have an opportunity to be heard on the claims

against them.[21]

**F.    Judicial Estoppel**

The Defendants argue that, regardless of whether their contracts were *actually*

assumed at the time of the Sale, the Plan Administrator is judicially estopped from pursuing

these preference actions, since his current position that they were not assumed contradicts

---

[21] In addition, if the Plan Administrator is successful, the Defendants will be able to file
claims against the bankruptcy estate pursuant to 11 U.S.C. § 502(h) and they will be entitled to
recover a dividend on those claims equal to other members of the same class.

the Debtor's earlier representations that the contracts were being sold in connection with the Sale.   In the First Circuit, "[t]he doctrine of judicial estoppel takes effect when the proponent has shown that the party to be estopped 'succeeded previously with a position directly inconsistent with the one [it] currently espouses.'" <u>Fleet National Bank v. Gray (In re Bankvest Capital Corp.)</u>, 375 F.3d 51, 61 (1st Cir. 2004) (<u>quoting</u> <u>Lydon v. Boston Sand & Gravel Co.</u>, 175 F.3d 6, 13 (1st Cir. 1999)).   "The doctrine is borne of 'a universal judicial reluctance to permit litigants to "play fast and loose" with courts . . . .' as well as a desire 'to protect . . . the judicial process from abuse.'" <u>United States v. Levasseur</u>, 846 F.2d 786, 796 (1st Cir. 1988) (quoting 1B J. Moore & J. Lucas, <u>Moore's Federal Practice</u> ¶ 0.405[8] (2d ed. 1984) (citing <u>Scarano v. Central R. Co. of N.J.</u>, 203 F.2d 510, 513 (3d Cir. 1953)).

Throughout the sale process – at hearings, through motions and in relevant sale documents – the Debtor represented that any contracts to be assumed in connection with the Sale would be clearly identified.   This is, in fact, what happened. Following the Sale Auction, this Court requested the Debtor to file a motion to assume and assign the buyers' designated contracts.   The Debtors did so, and this Court approved the assumption and assignment of those contracts.   At no time did the Debtors argue or lead this Court to believe that they intended to assume other contracts in connection with the sale. Furthermore, the Sale Order specifically notes that the only contracts assumed and assigned pursuant to the sale were those listed in the Motion to Assume and the order approving the assumption of contracts in connection with the Sale.   The Sale was not consummated *because* the Debtor represented that contracts would be assumed and assigned; rather, it was consummated *in spite of* the fact that no contracts, other than the two designated real property leases, were being assumed pursuant to § 365.   There is no

34

indication that the Debtor and the Plan Administrator are "playing fast and loose" with this Court, as they have not taken inconsistent positions regarding the assumption of contracts in conjunction with the Sale. Therefore, the Plan Administrator is not judicially estopped from pursuing the preference actions on those grounds.

IV.    <u>CONCLUSION</u>

The Defendants' contracts have not been assumed pursuant to 11 U.S.C. § 365, and this Court declines to order the assumption of their contracts retroactive to the date of the Sale.  Therefore the asserted defenses against these preference actions based on the claimed assumption of the Defendants' contracts fails as a matter of law.  Furthermore, the Plan Administrator is not judicially estopped from pursuing his claims against the Defendants. Accordingly, the Plan Administrator's Motions for Partial Summary Judgment will be GRANTED. Each Defendant's Motion for Summary Judgment will be DENIED.  The Plan Administrator's Motions to Strike will also be DENIED.  Separate orders in conformity with this memorandum shall issue in conjunction herewith.

Dated: October 12, 2006                    By the Court,

10/12/2006

_____
Henry J. Boroff
United States Bankruptcy Judge

35